729 F.2d 844
 115 L.R.R.M. (BNA) 3352, 115 L.R.R.M. (BNA) 3445,
234 U.S.App.D.C. 358, 100 Lab.Cas. P 10,904
 ST. FRANCIS FEDERATION OF NURSES AND HEALTH PROFESSIONALS,
affiliated with the Wisconsin Federation of Nurses and
Health Professionals, affiliated with the American
Federation of Teachers, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
St. Francis Hospital, Modern Management, Inc., Intervenors.
ST. FRANCIS HOSPITAL, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Modern Management, Inc., St. Francis Federation of Nurses
and Health Professionals, Intervenors.
 Nos. 82-2024, 82-2474.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 15, 1983.
Decided March 16, 1984.
 
 Petitions for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Gregory N. Freerksen, Chicago, Ill., with whom Michael Radzilowsky, Chicago, Ill., were on the brief for St. Francis Federation of Nurses and Health Professionals, affiliated with the Wisconsin Federation of Nurses and Health Professionals, affiliated with the American Federation of Teachers, AFL-CIO, petitioner in No. 82-2024 and intervenor in No. 82-2474.
 David B. Kern, Milwaukee, Wis., with whom James C. Mallien, Thomas W. Ehrmann and Ely A. Leichtling, Milwaukee, Wis., were on the brief, for St. Francis Hosp., petitioner in No. 82-2474 and intervenor in No. 82-2024.
 David S. Fishback, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on the brief for respondent.
 Lawrence M. Cohen, Chicago, Ill., for Modern Management, Inc. intervenor in Nos. 82-2024 and 82-2474.
 Before MIKVA and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge MIKVA.
 Opinion dissenting in part filed by Circuit Judge GINSBURG.
 MIKVA, Circuit Judge:
 
 
 1
 This case arises from a 1979 anti-union campaign conducted by Saint Francis Hospital (Saint Francis or the Hospital) prior to a scheduled representation election among the Hospital's nurses. The Federation of Nurses and Health Professionals (the Union) lost the election by a few votes and filed unfair labor practice charges against the Hospital and its labor relations consultant, Modern Management (2M). The National Labor Relations Board (NLRB or the Board) absolved 2M of any liability, but concluded that the Hospital had committed numerous unfair labor practices which invalidated the election results. 263 NLRB 834 (1982). Rather than directing a new election, the Board ordered the Hospital to bargain with the Union.
 
 
 2
 This appeal consolidates two petitions for review of the Board's actions. In the first petition, the Hospital challenges the individual findings of unfair labor practices and the Board's decision to issue a bargaining order, rather than to order a new election. In the second petition, the Union challenges the Board's failure to hold the consulting firm liable for the commission of unfair labor practices and the Board's failure to prohibit Saint Francis from soliciting employees at the Hospital during working hours. We deny both petitions for review and grant enforcement of the Board's order in its entirety.
 
 
 3
 The issues raised by these petitions are more numerous than they are complex. The Board found that Saint Francis committed a series of unfair labor practices in the course of a heated anti-union campaign--practices that unlawfully coerced employees in the free exercise of their right to select a collective bargaining representative. Because of the "serious and pervasive ... impact" of the Hospital's unlawful conduct, the Board concluded that a bargaining order was appropriate. Id. at 837. The Hospital argues that, even if the Board is upheld in its findings of unfair labor practices, we should not enforce the Board's chosen remedy. At the very least, argues the Hospital, there should be a rerun election rather than an order that the Hospital bargain with the Union. This case was argued before this court nearly four years after the Union election was held at Saint Francis. Despite the Hospital's strenuous plea to the contrary, we fail to see how reversal of the Board's bargaining order and direction of a rerun election--a process that could take several more months and give rise to further protracted legal proceedings--would "effectuate the policies" of the National Labor Relations Act. 29 U.S.C. Sec. 160(c) (1976). The Board's discretion in fashioning remedies under the Act is extremely broad and subject to very limited judicial review. We therefore uphold the Board's bargaining order.
 
 BACKGROUND
 
 4
 Saint Francis is a hospital in Milwaukee, Wisconsin, which employs approximately 200 full-time and part-time non-supervisory registered nurses. During the spring of 1979 (unless otherwise stated all dates will refer to 1979), Hospital administrators met with members of the nursing staff on numerous occasions to discuss the nurses' dissatisfaction with certain aspects of the Hospital's operations. The administrators knew that some nurses were interested in unionizing.
 
 
 5
 In June, the Federation of Nurses and Health Professionals commenced an organizing campaign within the Hospital. By August 17, a majority--123 out of 207--of the Hospital's non-supervisory registered nurses (the nurses) had signed cards designating the Union as their exclusive bargaining representative. The Union filed an election petition with the NLRB on August 23. The Board granted the petition on September 28 and set the election date for October 26.
 
 
 6
 The Union and the Hospital intensified their campaigns in the fall. Saint Francis had occasionally used the services of a consultant, 2M, for assistance in coordinating its employee relations efforts. It retained the firm in 1976 to advise it on how to resist a previous unionization campaign. In September, the Hospital again retained 2M to serve as its campaign advisor in the upcoming election. The firm advised supervisors as to how to approach employees to urge them to vote against unionization and explained what forms of persuasion were lawful. Throughout the fall, supervisors initiated numerous conversations with members of the nursing staff concerning unionization. The supervisors' conduct was the basis for most of the unfair labor practice charges subsequently brought by the Union.
 
 
 7
 On September 19, the Administrator of Saint Francis was replaced by American Healthcare Management, Inc. headed by David Rose. As Acting Administrator of the Hospital, Rose sent numerous communications to the staff voicing his concerns over unionization. Two weeks prior to the election, Rose announced that there would be a ten percent across-the-board wage increase for all employees on November 4, that employees would be eligible for merit increases beginning in January, 1980, and that the Hospital would consider further cost-of-living increases in July, 1980.
 
 
 8
 The election was held on October 26 and the Union lost by a vote of 95-100. The Union subsequently filed unfair labor practice charges with the Board, claiming that the Hospital and 2M unlawfully interfered with the Union's organizational campaign. After a hearing, the Administrative Law Judge (ALJ) found against the Hospital in most respects. He concluded that the Hospital violated section 8(a)(1) of the National Labor Relations Act (NLRA or the Act), 29 U.S.C. Sec. 158(a)(1) (1976), by coercing employees through promises and grants of benefits and through interrogations and threats of reprisals. He also determined that the Hospital violated section 8(a)(3) of the Act, 29 U.S.C. Sec. 158(a)(3) (1976), by denying employees registration fees and leave to attend a Union-sponsored training seminar.
 
 
 9
 As previously indicated, the Union had obtained a majority of designation cards from the registered nurses in the unit. To remedy the effects of Saint Francis' unlawful conduct, the ALJ recommended that the Hospital be ordered to bargain with the Union. He also recommended that the Hospital be ordered to provide the Union with access to employees on Hospital grounds during working hours so as to equalize the access to employees which the Hospital already enjoyed. The ALJ, however, recommended dismissal of the claims against 2M, concluding that the firm could not be held responsible under the Act for the commission of any unfair labor practices.
 
 
 10
 The Board adopted the ALJ's recommended order with certain modifications. It found that Saint Francis had committed numerous unfair labor practices and agreed with the ALJ that a bargaining order was an appropriate remedy in light of the "serious and pervasive ... impact" of the Hospital's unlawful conduct. 263 NLRB at 837. It also upheld the ALJ's determination that 2M was not responsible for the commission of any unfair labor practices, but reversed the ALJ's imposition of an equal access remedy.
 
 DISCUSSION
 
 11
 Our standard of review in this case is well established. We must uphold the Board's findings if they are "supported by substantial evidence on the record considered as a whole ...." 29 U.S.C. Sec. 160(e) (1976). See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Pedro's Inc. v. NLRB, 652 F.2d 1005, 1007 (D.C.Cir.1981). We apply a "deferential standard of review ... when the Board engages in a reasoned exercise of its expert judgment." Conair Corp. v. NLRB, 721 F.2d 1355 at 1373 (D.C.Cir.1983).
 
 
 12
 The Board has broad authority to devise remedies which will "effectuate the policies" of the National Labor Relations Act, 29 U.S.C. Sec. 160(c) (1976), and its "choice of remedies is entitled to a high degree of deference by a reviewing court." Teamsters Local 115 v. NLRB, 640 F.2d 392, 399 (D.C.Cir.1981), cert. denied, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964) (the Board's remedial power "is a broad, discretionary one, subject to limited judicial review"). We should not disturb the Board's order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). A central policy of the Act is "to 'effectuat[e] ascertainable employee free choice' and 'expressed' majority sentiment." Conair, at 1383 (quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1965)). When either the employer or the employees "create[ ] a climate inimical to an untrammeled selection process, Congress intended the Board to exercise broad discretion in fashioning a remedy...." Teamsters Local 115, 640 F.2d at 404. With these guidelines in mind, we turn to the merits of the petitioners' claims.
 
 I. THE HOSPITAL'S CLAIMS
 
 13
 Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act]." 29 U.S.C. Sec. 158(a)(1) (1976). Among the rights protected by this provision are the employees' "right to self organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing ...." 29 U.S.C. Sec. 157 (1976). The right of employees to exercise freedom of choice in selecting their collective bargaining representatives is "at the very center of our national labor relations policy." Conair, at 1378. When an employer interferes with the exercise of this right by coercing employees to oppose unionization, it violates section 8(a)(1) of the Act.
 
 
 14
 The Board found that Saint Francis committed numerous unfair labor practices which may be grouped into five separate categories: announcement of a wage increase two weeks prior to the Union election; the unlawful promise of benefits; threats to employees for supporting the Union; interrogation of employees as to their support for the Union; and a discriminatory refusal to pay registration fees and grant time off to employees to attend a Union-sponsored seminar in violation of section 8(a)(3) of the Act. 29 U.S.C. Sec. 158(a)(3) (1976). Saint Francis petitions for review of the Board's specific findings of unfair labor practices and its imposition of a bargaining order.
 
 
 15
 We hold that there is substantial evidence to support the findings of unfair labor practices by the Board. "Although each of these findings is vigorously contested by the [Hospital], it is firmly established that findings of the Board are entitled to judicial deference if supported by substantial evidence." Pedro's Inc. v. NLRB, 652 F.2d 1005, 1007 (D.C.Cir.1981). In holding that there is substantial evidence to support the Board's findings of unlawful threats and interrogations we are mindful of the Supreme Court's admonition in NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1965) that we "take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." Because the Hospital's claims concerning the wage increase, the promise of benefits, and the seminar policy raise questions about the applicable legal principles, we set forth our reasoning as to those issues in some detail.
 
 A. The Wage Increase
 
 16
 When a representation election is pending, conferral of benefits "for the purpose of inducing employees to vote against the union" interferes with the employees' protected right to organize. NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964). Section 8(a)(1) "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." Id.
 
 
 17
 An 8(a)(1) violation may occur where the timing of an otherwise legitimate conferral of benefits is too close to an election. If a benefit is "granted in the normal course of the business of an employer, without any motive of inducing employees to vote against the union ..." no violation occurs. Pedro's, 652 F.2d at 1008 (emphasis added). This "normal course of business" analysis applies to two distinct issues: the decision to confer benefits and the timing of the grant of such benefits. Id. at 1008 n. 9. Thus the timing of the announcement of a wage increase may violate section 8(a)(1), "even though the employer's initial decision to raise wages was perfectly legitimate." J.J. Newberry Co. v. NLRB, 645 F.2d 148, 151 (2d Cir.1981). See also NLRB v. Styletek, Division of Pandel-Bradford, Inc., 520 F.2d 275, 280 (1st Cir.1975).
 
 
 18
 We agree with the ALJ that, under the facts of this case, the timing of the wage increase raised "a strong presumption" that the Hospital intended to interfere with the employees' section 7 rights. 263 NLRB at 850. See Pedro's, 652 F.2d at 1009 and n. 11. In Styletek, the court explained:
 
 
 19
 Wage increases and associated benefits may be well warranted for business reasons; still the Board is under no duty to permit them to be husbanded until right before an election and sprung on the employees in a manner calculated to influence the employees' choice.
 
 
 20
 ....
 
 
 21
 ... [W]hen an employer, without having some fairly rudimentary factual explanation for the timing, announces benefits after the petition for election is filed and two weeks before a representation election, it must take the chance that the Board will ascribe to it improper motives.
 
 
 22
 520 F.2d at 280, 282 (citations omitted).
 
 
 23
 The Board's conclusion that Saint Francis failed to provide an adequate justification for the increase is supported by substantial evidence. The wage increase was announced two weeks prior to the representation election and constituted a change in Saint Francis' policy. Prior to 1979, the Hospital granted pay raises to its employees twice a year. Each employee received an across-the-board increase in January or February and a merit increase on the anniversary of his or her employment with the Hospital. In January, 1979, the Hospital announced its intention to comply with President Carter's wage guidelines. It provided a seven percent annual cost-of-living raise to all staff and announced that it would discontinue its policy of granting additional merit increases during the year.
 
 
 24
 Other hospitals in Milwaukee adopted similar policies, but by early summer, some of them had already deviated from the Carter guidelines. During the summer--while the Union's organizational campaign intensified--the Hospital's Personnel Director, Mr. Smith, made two separate recommendations to the administration concerning wage increases. On July 3, Smith recommended that the Hospital increase the entry rate for nurses so that Saint Francis would be competitive with other area hospitals. No action was taken on that recommendation. On August 22, five days after the Union had obtained a card majority, Smith submitted specific wage increase calculations to Hospital administrators urging them to adopt the wage increases and to announce that decision to the employees within ten days. One day later, the Union filed its election petition with the Board.
 
 
 25
 The Hospital did not take any immediate action on either of Smith's recommendations. Then, on October 12--two weeks prior to the Union election--David Rose, the new Administrator, announced three new wage policies for the Hospital: an across-the-board increase of ten percent which would go into effect on November 4; the reinstitution of merit pay increases beginning on January 1, 1980; and the Hospital's intention to consider further wage increases in July, 1980.
 
 
 26
 Saint Francis contends that there was a legitimate business justification for the pay increase. Because other hospitals in Milwaukee were raising wages in violation of President Carter's voluntary guidelines, Saint Francis argues that it needed to raise its wages to remain competitive. Assuming arguendo that the size of the wage increase was justified, Saint Francis has failed to provide an adequate business justification for timing the announcement of the increase two weeks prior to the election.
 
 
 27
 The Hospital justifies the timing of the announcement on the ground that it was in an unresolvable dilemma. Personnel Director Smith recommended specific wage increases in August. Thus the Hospital had been considering wage increases long before the October announcement and had avoided granting an increase while the Union's election petition was pending before the Board. Furthermore, when it announced adherence to President Carter's guidelines in January, the Hospital said it would consider a further increase if money became available later in the year. The Hospital argues that, combined with the timing of Smith's specific recommendations in August, the nurses' expectations of a wage hike placed it in a no-win situation. If it granted a benefit, it might be charged with committing an unfair labor practice. Yet the withholding of benefits during a union campaign that are customarily granted to employees also violates the Act. See Pedro's, 652 F.2d at 1008 n. 8. One court aptly described this dilemma as "damned if you do, damned if you don't." J.J. Newberry, 645 F.2d at 151. According to Saint Francis, Administrator Rose carefully avoided mentioning a wage increase to employees until he "received clearance from the Hospital's legal counsel."
 
 
 28
 The "dilemma" analysis urged by Saint Francis does not apply to the facts of this case. The wage increase was a change in the Hospital's policy, not a benefit "customarily granted to employees." Pedro's, 652 F.2d at 1008 n. 8. Although granting a wage increase in late August, while the election petition was pending, might have constituted an unfair labor practice, so was granting that increase two weeks prior to the Union election. The fact that Hospital management scrupulously avoided promising a wage increase until their legal staff gave the go-ahead indicates only that they received dubious legal advice, not that the announcement was lawful. Two of the three wage policies announced by Rose were not scheduled to go into effect until the following year. Having waited nearly two months to announce a wage hike, Saint Francis failed to explain why it could not have waited an additional two weeks.
 
 
 29
 Nor does the case relied upon by the Hospital support its dilemma argument. In J.J. Newberry, 645 F.2d 148, the court found an 8(a)(1) violation where the employer announced a wage increase prior to an election. The court concluded, however, that the withholding of that increase earlier in the campaign did not violate the Act because the employer had been in an unresolvable "dilemma" at that time. Id. at 151-52. J.J. Newberry supports the argument that the Hospital's failure to grant an increase in August was lawful; it does not support the Hospital's contention that the October announcement was also lawful.
 
 
 30
 Saint Francis further argues that the wage increase was not designed to influence the election because it applied across-the-board and was not limited to those employees who would be voting in the election. But in the cases relied upon by the Hospital to support this argument, only a small percentage of employees who received the increase were in the affected bargaining unit. See e.g., MGM Grand Hotel-Reno, Inc. v. NLRB, 653 F.2d 1322 (9th Cir.1981) (where only 49 of the 1200 employees who received the increase were in the affected bargaining unit); Delchamps, Inc. v. NLRB, 588 F.2d 476 (5th Cir.1979) (where the wage increase affected 44 stores, only 15 of which were involved in unionization). In contrast, Saint Francis has not cited any statistics to show what percentage of staff employees receiving the wage increase were in the affected bargaining unit. Moreover, the Board asserts--and Saint Francis has not denied--that employees other than those in the nurses' bargaining unit were engaged in organizing activities at Saint Francis in 1979. Thus the wage increase might have been reasonably calculated to discourage union activities throughout the Hospital. We conclude that there is substantial evidence to support the Board's finding that the announcement of the wage increase two weeks before the election constituted an unfair labor practice.
 
 B. Promise of Benefits
 
 31
 An employer's promise of benefits during a union campaign violates the Act if the promise is reasonably calculated to induce employees to vote against the union. See Exchange Parts, 395 U.S. at 409, 84 S.Ct. at 459; International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. NLRB, 392 F.2d 801, 806 (D.C.Cir.1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968). Here, the Board found that the Hospital made an implied promise that it would grant employees benefits if they voted against the Union. According to the ALJ, "[a]lthough the promised benefits are not specifically stated, the message was obvious (especially after the October 12 wage increase and other promises) that management would improve conditions if the nurses rejected the Union." 263 NLRB at 841 n. 5.
 
 
 32
 The Board has cited numerous examples of statements which, it asserts, collectively constitute an unlawful implied promise of future benefits. Most of the statements were made by supervisory staff urging nurses not to vote for the Union because, e.g., there was "going to be a new administrator," the new Administrator should be given "one year," problems would be taken care of "if you just give us one year" and if you give the new administrator "a chance." Some of the statements were more direct. For instance, the Assistant Nursing Director told one of the nurses that they could "get things a lot faster by working with the new administration, give them one year and [you] will get what [you] want." Another supervisor said to one of the nurses: "What is it you girls are really unhappy about? You have your ten percent raise. What else could you possibly want?" 263 NLRB at 841.
 
 
 33
 Saint Francis argues that these statements are lawful in light of the fact that Hospital officials consistently refused to make specific promises of benefits during the election campaign. But an explicit promise of benefits is not required for the Board to find a violation of section 8(a)(1). As the First Circuit recently stated: "His [the supervisor's] refusal to give a specific promise did not demonstrate the absence of an implied, general promise." NLRB v. Cable Vision, Inc., 660 F.2d 1, 6 (1st Cir.1981) (emphasis in original). See also Peavey Company v. NLRB, 648 F.2d 460, 462 (7th Cir.1981); Hubbard Regional Hospital v. NLRB, 579 F.2d 1251, 1256-57 (1st Cir.1978).
 
 
 34
 We are mindful of Saint Francis' concern that the Board not transform the isolated, innocuous statements of an employer into unlawful conduct. See 29 U.S.C. Sec. 158(c) (1976) ("The expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."). But the conduct here consisted of repeated statements made in the context of "numerous acts of objectionable conduct [by the employer] during the critical period." Royal Petroleum Company, 243 NLRB 508 n. 2 (1979). Particularly in the context of the pre-election announcement of wage increases in November and further possible increases the following year, the "give us a year" pleas by the administration took on greater significance. Compare Waterbury Community Antenna, Inc., 233 NLRB 1312, 1317-19, 1322 (1977), aff'd in part on other grounds, 587 F.2d 90 (2d Cir.1978) (in the context of a free-wheeling debate over unionization, a supervisor's single statement that the company should be given a fair chance for another year did not violate the Act). Nor does the fact that David Rose was a new administrator insulate Saint Francis from the Board's findings that the Hospital's implied promises of benefits to its employees violated the Act.
 
 C. Union-Sponsored Training Seminar
 
 35
 Section 8(a)(3) makes it an unfair labor practice for an employer "to discourage membership in any labor organization" through "discrimination with regard to ... any term or condition of employment." 29 U.S.C. Sec. 158(a)(3) (1976). Prior to the organizational campaign in 1979, the Hospital had always granted registration fees and time off for nurses to attend education seminars, including those sponsored by unions. After the election, however, the Hospital refused to send two nurses to a Union-sponsored seminar. One of the nurses was a Union supporter; the other nurse was not.
 
 
 36
 The ALJ found that the denial of the nurses' requests to attend the seminar was unlawful. Even with regard to the nonunion supporter, the ALJ concluded that the Hospital "violated Section 8(a)(3) because [the denial of her request] amounts to an employer discriminating against a group of employees in order to reach the pro-union employees." 263 NLRB at 846. The Board upheld this decision, explaining:
 
 
 37
 [W]e rely on the fact that the Hospital's refusal was admittedly motivated by the fact that the seminar was sponsored by a union. Even though the Hospital had allowed employees to attend union-sponsored seminars in past years when there was no union activity among its employees, it refused to allow employees to attend such seminars when its employees were actively involved in union activities. Thus, regardless of whether the employees who applied to attend the seminar were prounion or anti-union, the Hospital's motivation was the same, i.e., to take away a benefit because of its employees' exercise of their Sec[tion] 7 rights ....
 
 
 38
 Id. at 834 n. 2.
 
 
 39
 Saint Francis contends that there was no discriminatory treatment of employees within the meaning of section 8(a)(3) because the prounion and antiunion nurses were treated similarly. Yet the Hospital's policy toward seminar attendance changed because of Union activity among the nurses at Saint Francis. The critical factor here is not the union sympathies of the two nurses, but the fact that the seminar was sponsored by the Union. By discouraging employee participation in a Union-sponsored activity, the Hospital sought to diminish employee participation in a legitimate Union activity, thus discouraging membership in the Union. "A practice applied uniformly to all employees may be discriminatory and violate the Act .... Conduct by an employer which discourages a union activity protected by Sec. 7 may also discourage and discriminate against membership in a labor organization." Allied Industrial Workers, AFL-CIO, Local 289 v. NLRB, 476 F.2d 868, 877 (D.C.Cir.1973) (footnote omitted).
 
 
 40
 The Hospital also claims that the new Administrator, David Rose, had no knowledge of the Hospital's preexisting policy of permitting attendance at Union seminars or of the Union sympathies of the nurses who requested to attend the seminar. Yet the Hospital concedes that the new policy was motivated by Rose's "philosophical opposition to Union sponsored seminars." Even where discriminatory conduct has only a "comparatively slight" effect on employee rights, "the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). See Allied Industrial Workers, 476 F.2d at 877. Because "philosophical opposition to Union sponsored seminars" is hardly a legitimation of the Hospital's change in policy, the Board's finding of a section 8(a)(3) violation must be upheld.
 
 D. The Bargaining Order
 
 41
 As previously explained, the Board has a great deal of discretion in devising remedies that will best serve the purposes of the Act and its choice of remedies is entitled to considerable deference by a reviewing court. In this case we are asked to review a "type two" bargaining order approved by the Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1965). Where the Union once has exhibited majority support, the Board may issue a bargaining order in cases marked by practices that "have the tendency to undermine majority strength and impede the election processes." Id. at 614, 89 S.Ct. at 1940. In fashioning such a remedy, the Board may properly consider "the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." Id. (emphasis added). In Gissel, "[t]he Court made clear that it was the Board's responsibility to ascertain on a case-by-case basis whether in fact conditions were not conducive to a 'fair and reliable election.' " Oil, Chemical and Atomic Workers International Union v. NLRB, 445 F.2d 237, 247 (D.C.Cir.1971) (quoting Gissel, 395 U.S. at 614, 89 S.Ct. at 1940), cert. denied, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972). In making that determination, "the Board draws on a fund of knowledge and expertise all its own." Gissel, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32.
 
 
 42
 We recently outlined the three prerequisites for issuance of a type-two Gissel bargaining order. See Road Sprinkler Fitters Local Union No. 669 v. NLRB, 681 F.2d 11, 22 (D.C.Cir.1982), cert. denied, 459 U.S. 1178, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983). First, the Union, at some time, must have had majority support within the bargaining unit. Second, the employer's unfair labor practices must have had the tendency to undermine majority strength and impede the election process. Finally, the Board must determine that the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order. In this case, the first two prerequisites clearly have been met: a majority of the nurses signed Union authorization cards and there is substantial evidence that the Hospital's unfair labor practices tended to undermine majority strength and impede the election process. See Pedro's, 652 F.2d at 1011.
 
 
 43
 The Hospital contends that the third prerequisite has not been met. Under the third prerequisite, the issue is whether "the bargaining order better protects employees' expressed Union preference" than any other available remedy. See Road Sprinklers, 681 F.2d at 24. Assessing the appropriateness of the bargaining order remedy "is a determination largely within the special competence of the Board." Id.
 
 
 44
 Many recent court decisions have imposed a requirement that the Board give detailed, specific reasons explaining its decision to issue a bargaining order. See, e.g., NLRB v. Apple Tree Chevrolet, Inc., 671 F.2d 838, 840-41 (4th Cir.1982); Red Oaks Nursing Home, Inc. v. NLRB, 633 F.2d 503, 508-09 (7th Cir.1980); NLRB v. Jamaica Towing, Inc., 602 F.2d 1100, 1103 (2d Cir.1979); First Lakewood Associates v. NLRB, 582 F.2d 416 (7th Cir.1978). The Fourth Circuit Court of Appeals, sitting en banc, recently explained that the purpose of "requiring specificity in the Board's findings and reasoning ... is to facilitate an informed review." NLRB v. Maidsville Coal Company, 718 F.2d 658 (4th Cir.1983) (en banc). The specificity requirement enables a reviewing court to determine whether the Board applied the Gissel standards to a particular set of facts. "To facilitate review under those standards, the Board must support a Gissel order by a statement of reasons stating what unfair labor practices the order is intended to redress and indicating in general why traditional remedies are inadequate in the circumstances." Id. at 660 (quoting Standard-Coosa-Thatcher Carpet Yarn Division, Inc. v. NLRB, 691 F.2d 1133, 1144 (4th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983)).
 
 
 45
 We agree with the Fourth Circuit that the Board should state clearly its reasons for issuing a bargaining order and we conclude that the Board here has met this obligation. The Board emphasized the pervasiveness of the Hospital's unlawful conduct when it explained why a bargaining order would better protect employee sentiment previously expressed through authorization cards: "From the very day that the Union filed its election petition ... the Hospital embarked on a course of retaliatory unfair labor practices .... This unlawful activity was committed by at least eight different supervisors and involved numerous employees." 263 NLRB at 836. The Board placed particular emphasis on the unlawful wage increase because it affected all employees, but it also relied upon the whole litany of unfair labor practices that characterized the Hospital's anti-Union campaign--interrogations, threats, and promises of benefits--in deciding that a bargaining order was appropriate. The Board explained:
 
 
 46
 [W]e find that the Hospital's unfair labor practices are serious and pervasive in their impact--the unlawful wage increase in particular having touched all unit employees. Such conduct can reasonably be expected to have a lingering effect on employees, by signalling to them the Hospital's displeasure at union activity and the lengths to which it would go to stifle the employees' right to self-organization.... [W]e find that simply requiring the Hospital to refrain from repeating such conduct, the traditional remedy, will not erase the effects of this unlawful conduct, and will not enable the employees to participate in a free and uncoerced rerun election.
 
 
 47
 Id. at 837. Furthermore, the Board found that the decision not to allow nurses to attend a Union-sponsored seminar after the election "emphasized to employees that the Hospital would continue to punish them for their union activities even after the election, and thus served to remind them, lest they forgot, that their support for the Union, or activities on its behalf, would not be tolerated." Id. We find this to be an adequate explanation of the Board's decision to issue a bargaining order and cannot say that this is a "patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric, 319 U.S. at 540, 63 S.Ct. at 1218.
 
 
 48
 The Hospital argues that events which occurred subsequent to the election render a bargaining order inappropriate. Some courts indeed have imposed a duty on the Board to inquire into subsequent developments before issuing a bargaining order. See, e.g., NLRB v. Heads & Threads Co., 724 F.2d 282 at 289 (2d Cir.1983) ("the Board may issue a bargaining order only after it has taken evidence and made appropriate findings as to the need for the bargaining order at the time it is issued, not at some earlier date"). On occasion, this court has directed the Board to consider specific significant events which occurred after an election. See, e.g., Peoples Gas System, Inc. v. NLRB, 629 F.2d 35, 48 (D.C.Cir.1980) (where there was both an "extraordinary delay between the initial refusal to bargain and the ultimate formulation of the remedy ... [and] a clear, uncoerced expression in the interim by the employees that they do not desire the Union to represent them") (emphasis added); NLRB v. Ship Shape Maintenance Co., 474 F.2d 434, 443 (D.C.Cir.1972) (where there was an "extraordinary rate of turnover" in the affected unit).
 
 
 49
 We have never, however, imposed a blanket requirement on the Board that it consider subsequent events before issuing a bargaining order and we refuse to do so today. The lapse of time alone is insufficient grounds for overturning a bargaining order because "holding a rerun election simply because of the passage of time rewards employer recalcitrance and offers no deterrence to future unfair labor practices." Peoples Gas, 629 F.2d at 47-48. See NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114 n. 16, 8 L.Ed.2d 230 (1962). Nor does normal employee turnover justify displacing the Board's determination that a bargaining order is appropriate. Franks Bros. Co. v. NLRB, 321 U.S. 702, 704-05, 64 S.Ct. 817, 818-19, 88 L.Ed. 1020 (1944). Imposition of a requirement that the Board consider subsequent events would reward an employer's efforts to postpone enforcement of a remedy by adding further delay to the proceedings. As the Ninth Circuit has explained:
 
 
 50
 [Delay] is an unfortunate but inevitable result of the process of hearing, decision and review prescribed in the Act. And to deny enforcement, with or without remand for reconsideration on the basis of facts occurring after the Board's decision, is to put a premium upon continued litigation by the employer; it can hope that the resulting delay will produce a new set of facts, as to which the Board must then readjudicate. Suppose that the Board does so, and again finds against the employer. There can then be a petition to this court, a decision by it, and a petition for certiorari to the Supreme Court. By that time there will almost surely be another new set of facts. When is the process to stop?
 
 
 51
 NLRB v. L.B. Foster Co., 418 F.2d 1, 4 (9th Cir.1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970).
 
 
 52
 The subsequent events cited by Saint Francis are not significant enough to justify a remand to the Board. Passage of time, changes in three supervisory personnel, and the posting of a notice and distribution of a handbook apprising all Hospital employees of their rights under the Act are not noteworthy events that are likely to undermine the Board's ability to infer from circumstances which existed at the time of the violations whether a bargaining order is warranted.
 
 
 53
 The ALJ concluded that "[s]ince September 22, 1979, the Union has represented a majority of the employees in the ... appropriate bargaining unit, and since that date the Union has been the exclusive bargaining representative of said employees." 263 NLRB at 852. The Hospital has expressed concern that this finding could be construed as making the bargaining order retroactive to September 22, 1979. The Board's decision contains no conclusion or order that Saint Francis bargain with the Union as to matters arising on or after that date, and the Board asserts that retroactive application of the bargaining order--if relevant at all--is a matter for subsequent compliance proceedings. We express no opinion on the propriety of issuing a retroactive bargaining order in this case. See Road Sprinkler, 681 F.2d at 24-25 & n. 18 (discussing the appropriateness of making a bargaining order retroactive).
 
 
 54
 The delay which would result if we overturned the Board and ordered a rerun election makes us particularly reluctant to disturb the Board's finding that a bargaining order was appropriate. Delay alone is often the goal of an employer reluctant to bargain with the employees' chosen representative. In rejecting the claim that employee turnover justifies overturning a Board bargaining order, the Supreme Court discussed the employer's interest in encouraging further delay:
 
 
 55
 The Board might well think that were it not to adopt this type of remedy, but instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation. In the Board's view, procedural delays necessary fairly to determine charges of unfair labor practices might in this way be made the occasion for further procedural delays in connection with repeated requests for elections, thus providing employers a chance to profit from a stubborn refusal to abide by the law.
 
 
 56
 Franks Bros., 321 U.S. at 705, 64 S.Ct. at 819. See Weiler, Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA, 96 HARV.L.REV. 1769, 1777 & n. 24 (1983) (analyzing data indicating that delay before an election serves the employer's interest in discouraging employee support for the union).
 
 
 57
 We choose not to second-guess the Board's judgment and further postpone the Hospital's performance of its statutory obligations. Saint Francis Hospital is not entitled to use the processes of this court to seek further delay or benefit from the consequences of the unfair labor practices which it committed during the election campaign four years ago. The Board has explained its reasoning and applied its expertise in choosing a remedy that can best effectuate the policies of the National Labor Relations Act. We therefore enforce the Board's bargaining order.
 
 II. THE UNION'S CLAIMS
 
 58
 A. Modern Management's Liability under the NLRA
 
 
 59
 The Union seeks to hold the consulting firm hired by Saint Francis responsible for the unfair labor practices committed by Hospital supervisors. According to the Union, 2M knowingly participated and consciously assisted in the effectuation of those unfair labor practices. See NLRB v. Gluek Brewing Co., 144 F.2d 847, 855 (8th Cir.1944).
 
 
 60
 Modern Management is an "employer" engaged in commerce within the meaning of sections 2(6) and 2(7) of the NLRA and therefore subject to the provisions of the Act. See 29 U.S.C. Secs. 152(6) and (7) (1976). A statutory "employer" may violate section 8(a)(1) "with respect to employees other than his own." Hudgens v. NLRB, 424 U.S. 507, 510 n. 3, 96 S.Ct. 1029, 1032 n. 3, 47 L.Ed.2d 196 (1976). In this case, however, it is undisputed that 2M had no direct contact with any of the Hospital's non-supervisory employees who were the target of the Union's organizational campaign. 263 NLRB at 848-49. The question, therefore, is whether 2M can be held responsible under the Act for the unfair labor practices committed by the Hospital's supervisors. The Board's conclusion that, under the circumstances of this case, 2M is not liable for the supervisors' unlawful conduct is supported by substantial evidence.
 
 
 61
 As the Hospital's advisor, Modern Management directed the anti-Union campaign at Saint Francis in the fall of 1979. Id. at 848. Saint Francis gave 2M access to Hospital facilities and instructed its supervisory employees to "accept the advice and carry out the instructions of ... 2M representatives." Id. at 849. Representatives of 2M did not contact non-supervisory employees directly, but they advised Hospital supervisors on how to approach such employees.
 
 
 62
 Although 2M provided considerable guidance to Hospital supervisors, the ALJ found--and the Board agreed--that 2M did not instruct or advise those supervisors to violate the Act. Specifically, the ALJ found that 2M did not instruct the supervisors "to engage in unlawful interrogation" or "to ask the nurses how they intended to vote." Id. at 850. Nor were supervisors "told to mention employee names when reporting the general reactions." Id. The Union claims that these findings were incorrect and points to testimony in the record indicating that a supervisor was asked by 2M representatives to report "who was for and who was against the Union." But that testimony was contradicted by another supervisor who claimed that 2M "exhorted" the supervisors not to ask employees if they were for or against the Union. Considering the record as a whole, there is substantial evidence to support the conclusion that 2M did not advise or otherwise encourage the supervisors to engage in unlawful conduct.
 
 
 63
 This case is a far cry from NLRB v. Gluek Brewing Co., 144 F.2d 847 (8th Cir.1944), where an independent contractor was found guilty of committing unfair labor practices. Gluek operated a brewing company and employed its own drivers to deliver the beer locally. A labor controversy between the two warring unions that sought to represent Gluek's drivers led to the disruption of Gluek's deliveries. Gluek subsequently contracted with a trucking company to make the deliveries for Gluek. The contractor's drivers were members of one of the warring unions. Not only did the contractor know of the controversy, "[i]t knew in taking over the delivery for Gluek that it would really determine that conflict." 144 F.2d at 856. The court concluded that "[s]uch conscious interference was an unfair labor practice." Id. In contrast, 2M advised Saint Francis on the lawful means it could use to encourage employees to vote against the Union. Its mere presence in the Hospital as an advisor during the campaign did not constitute unlawful interference with the protected rights of Hospital employees.
 
 
 64
 Not only did 2M advise the supervisors to engage in lawful conduct, the Board's position is further supported by the fact that Saint Francis retained ultimate authority over the conduct of its supervisors. There is no allegation that 2M acted as the Hospital's agent in advising the supervisors. Nor was any evidence introduced indicating that 2M "could make or implement any employment decisions on behalf of the hospital or assume or exercise any of its managerial rights or duties." 263 NLRB at 849. See A.M. Steigerwald Co., 236 NLRB 1512 (1978); Fabric Services, Inc., 190 NLRB 540 (1971). In light of these circumstances, and particularly in light of the fact that 2M did not advise or instruct the supervisors to violate the Act, we uphold the Board's dismissal of the complaint against 2M.
 
 B. The Equal Access Remedy
 
 65
 Saint Francis' regulations prohibit employee solicitations and distributions on work time in work areas, but the Hospital conducted some of its own campaign efforts in the Hospital during work hours. The ALJ addressed this discrepancy by ordering the Hospital to grant the Union "equal access" to Hospital employees "with no requirement that it pay for the employees' lost work-time." 263 NLRB at 845. The Board reversed, stating that equal access is an extraordinary remedy that is not warranted in this case. The Union petitions this court, not to provide the Union access to employees at work during work hours, but to deprive the Hospital of any such access. This alternative argument was not presented to the Board. Because the Union is barred from raising a new argument on appeal, we do not reach the merits of its claim. Section 10(e) of the Act specifies: "No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. Sec. 160(e) (1976). The Union has not identified any "extraordinary circumstances" that prevented it from filing a rehearing or reconsideration petition with the Board before it brought this action in the Court of Appeals. See Teamsters Local 115, 640 F.2d at 398 (a petition for reconsideration would have allowed the Board to apply its labor relations expertise to the problem). We therefore do not have jurisdiction to consider the Union's equal access claim.
 
 CONCLUSION
 
 66
 We have no doubt that Congress contemplated a swifter decisional process under the National Labor Relations Act than has come to pass. The basic policy that employees are to choose freely whether a union should represent them and which union should do so is hardly effectuated by a four year delay in exercising and implementing that choice. Further protraction of these proceedings would further erode that policy. We enforce the Board's order in its entirety and deny the petitions for review filed by the Union and by Saint Francis Hospital.
 
 
 67
 It is so ordered.
 
 GINSBURG, Circuit Judge, dissenting in part:
 
 68
 I concur in the court's judgment with one large exception: I would not enforce the Board's order to the extent that it requires St. Francis to bargain with the Union. Instead, I would remand for closer analysis of the need for a bargaining order in the circumstances this case presents. The majority's otherwise exemplary opinion, I believe, brushes too much under the rug in accepting as "adequate" the Board's less than cogent, sometimes careless explanation of its decision to issue a bargaining order.[1]
 
 
 69
 The Supreme Court has instructed that, when the NLRB issues a bargaining order, it
 
 
 70
 draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.
 
 
 71
 NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969) (Gissel); see Standard-Coosa-Thatcher Carpet Yarn Division, Inc. v. NLRB, 691 F.2d 1133, 1144 (4th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983). The majority opinion appropriately calls attention to that instruction. In this case, however, there is in fact scant indication that the Board genuinely "assess[ed] the potential for a free and uncoerced election" in determining the need for, or propriety of, a bargaining order. See J.J. Newberry Co. v. NLRB, 645 F.2d 148, 153 (2d Cir.1981). Deference is not owed to an agency decision made "in knee jerk fashion." Id. Instead, the quality of the agency's decision largely affects the respect the administrative determination attracts in court. See, e.g., Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (relevant factors include "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and the] consistency [of the agency's decision] with earlier and later pronouncements"), quoted in Adamo Wrecking Co. v. United States, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978). Reading the NLRB's justification for the bargaining order against the record, I have grave doubts about the course the Board is pursuing, and find intelligent review of the agency's remedial choice impossible at this juncture.
 
 
 72
 In Gissel, the Supreme Court held that the NLRB can consider issuing a bargaining order if "at one point the union had a majority" and the employer has engaged in unfair labor practices "to undermine majority strength and impede the election processes." 395 U.S. at 614, 89 S.Ct. at 1940. Consideration of a bargaining order was proper here because a majority of the nurses had signed cards designating the Union as their representative and the Hospital's unlawful pre-election practices had "the tendency to" erode the majority support once achieved by the Union. See id. I travel together with the majority opinion thus far.
 
 
 73
 Gissel cautioned, however, that a bargaining order is not a routine remedy; it is a measure the Board should reserve for situations in which it "finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." Id. at 614-15, 89 S.Ct. at 1940-41; see Road Sprinkler Fitters Local Union No. 669 v. NLRB, 681 F.2d 11, 22 (D.C.Cir.1982), cert. denied, 459 U.S. 1178, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983). It is far from apparent that the Board heeded this admonition in directing St. Francis Hospital to bargain with the Union.
 
 
 74
 The Hospital's "hallmark violation," the Board maintained, consisted of a set of promises and grants of benefits; the "linchpin," according to the Board, was an announcement of wage increases some two weeks short of the election. Brief for the NLRB at 44 & n. 21. Coupled with and heightening the impact of the wage increase announcement, the Board emphasized, Hospital supervisory and administrative personnel repeatedly urged nurses to give management a chance, "one year" to take care of problems and make changes the nurses sought. Id. at 15-16.
 
 
 75
 The Hospital's cupboard in its anti-union campaign, as recognized at argument, was stocked for the most part with carrots, not big sticks:
 
 
 76
 Counsel for the NLRB: The employer ... created an aura of "we're going to make things a lot better here if you don't have the union."Court: In other words, this is a carrot case, not a stick case.
 
 
 77
 Counsel for the NLRB: Primarily; it's primarily a carrot case.
 
 
 78
 Both sides acknowledged the scarcity of nurses in the area; given that condition, threats of loss of employment were unlikely to serve the employer's interest. Cf. NLRB v. Maidsville Coal Co., 718 F.2d 658 (4th Cir.1983) (en banc) (bargaining order upheld, 6-4, where union had achieved a card majority and Board, in support of its conclusion that an election would not adequately reflect employee preferences, cited Company's intimidating practices--discharge of "four identified union supporters," threats of "discharge, layoff, and other reprisals, including the cessation or reduction of operations," and enlistment "of a third party to threaten an employee with physical harm").
 
 
 79
 As the majority opinion correctly points out, the timing of the wage increase announcement was inconsonant with the Act's strictures,[2] and the Hospital does not seriously argue otherwise. The 10% raise announced, however, did not put St. Francis in the lead position among area hospitals. The Board had evidence, counsel for the NLRB conceded at argument, that two other hospitals in the Milwaukee area offered comparable raises.[3] Nor was there any evidence that the Hospital's restoration of a 7 1/2% merit increase afforded its nurses a benefit unavailable at other Milwaukee-area hospitals. Again, counsel for the NLRB so conceded at argument.[4]
 
 
 80
 The Board did not explain why it concluded that wage increases not shown to place St. Francis out in front of all other area hospitals, and management pleas for one year "to make things better," see Brief for the NLRB at 15, would have enduring effects, leaving only a "slight" possibility of a fair rerun election. The facts and Board decision before us, in short, should generate "serious and pervasive" concern, cf. St. Francis Hospital, 263 NLRB at 837, whether the NLRB fairly determined that, "on balance, [employee sentiment would] be better protected by a bargaining order" than by a second election preceded by a reasonable but not protracted period in which the Union is accorded stringent notice and access remedies. See Teamsters Local 115 v. NLRB, 640 F.2d 392, 399-404 (D.C.Cir.) (upholding extraordinary notice and access remedies designed to inform employees of their statutory rights and assist the Union in communicating with employees), cert. denied, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); see also Conair Corp. v. NLRB, 721 F.2d 1355, 1384-85 (D.C.Cir.1983).
 
 
 81
 It may be that the Board, disquieted by the slow pace of its own procedures,[5] and aiming to deter employer misconduct, is embarking upon issuance of bargaining orders whenever an employer commits numerous or serious violations of the Act, whether or not it is reasonable to believe a fair election could be held. See NLRB v. Village IX, Inc., 723 F.2d 1360, 1370 (7th Cir.1983) (citing judicial and academic comment on Board's "stubborn refusal ... to make adequate findings to support the issuance of a bargaining order"); NLRB v. Marion Rohr Corp., 714 F.2d 228, 230, 231 (2d Cir.1983) ("clearly preferred remedy for violation of the Act is an election," but Board, in lieu of articulating reasons why it believes a fair election cannot be held, is "indulg[ing] ... [a] preference for issuing a bargaining order"). If this is the approach the Board is taking, it should forthrightly acknowledge what it is doing, and not pretend that it is closely examining cases to evaluate current prospects for an election untainted by past unlawful practices. All reviewing courts would then have an unavoidable obligation to determine whether the Board's extension of remedial policy comports with the governing statute. Cf. John Cuneo, Inc. v. NLRB, 459 U.S. 1178, 103 S.Ct. 831, 832, 74 L.Ed.2d 1025 (1983) (Rehnquist, J., joined by Powell, J., dissenting from denial of cert.) (expressing concern that "the bargaining order has been sanctioned without a finding that the special circumstances required by Gissel exist," and stating that "we should determine whether this newly adopted approach is a proper one").
 
 
 82
 In sum, I am concerned that the Board, with this court's tolerance, has shrunk to the vanishing point the supposed prerequisite to a bargaining order that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight." Gissel, 395 U.S. at 614, 89 S.Ct. at 1940.
 
 
 
 [1]
 The Board's opinion is marred by less than fully accurate statements at crucial points in its discussion. The Board's justification of its bargaining order, for example, places heavy emphasis on one statement made by Hospital Administrator Rose. The record evidence relating to the statement consists of the testimony of Nurse Joan Wolf, who stated: "I asked [Rose] about [2M]. At that time we had felt really under duress and I asked him about [2M] staying. And he told me directly, if the Union wins, [2M] stays. If the Union doesn't win, [2M] goes." Joint Appendix 125. The Board could indeed view the remark Nurse Wolf attributed to Rose as improper. Its rendition of the event, however, reads:
 [O]n October 11, Hospital Administrator David Rose held a meeting with a group of employees and in response to an employee question about [2M], coupled with the statement that the employees felt "really under duress," Rose stated, "If the Union wins, 2M stays. If the Union doesn't win, 2M goes." Under these circumstances, Rose's statement constituted a threat to the employees that, in the event of a union victory, management would continue to keep them "under duress."
 St. Francis Hospital, 263 NLRB 834, 836 (1982) (emphasis supplied). The Board's reading of the record is careless at best; nowhere in the record is there evidence of a statement made to Rose or any other member of the Hospital administration that the employees felt "under duress." Compounding the carelessness, the Board's incorrect rendition of Nurse Wolf's testimony is repeated in the brief Board Counsel filed in this court. See Brief for the NLRB at 8 n. 3.
 Following on the heels of its discussion of Rose's 2M statement, the Board observed:
 Moreover, that same day Rose announced an across-the-board wage increase effective November 4 for all employees--3 to 4 percent higher than wage increases in the past, a merit wage increase up to 7 1/2 percent by January 1, 1980, and a cost-of-living review by July 1, 1980.
 
 
 [263]
 NLRB at 836. The Board properly found that this announcement constituted an unfair labor practice. Nowhere in the Board's opinion, however, is there any hint that the "merit wage increase" Rose announced was merely the reinstitution of a regular merit increase program in place at the Hospital for years, but temporarily suspended in 1979 in an attempt to comply with President Carter's wage guidelines. See Majority Opinion at 850. The Board's quick and incomplete description of the "merit wage increase" does not inspire confidence in the care or dispassionateness of its decision
 
 
 [2]
 Even if a benefit is prompted by legitimate business reasons, announcement of it violates section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1), if made at a time "calculated to influence the employees' choice" whether to accept or reject union representation. Pedro's, Inc. v. NLRB, 652 F.2d 1005, 1008 n. 9 (D.C.Cir.1981) (quoting NLRB v. Styletek, Division of Pandel-Bradford, Inc., 520 F.2d 275, 280 (1st Cir.1975))
 
 
 [3]
 The following exchange occurred:
 Court: I understand your point about the timing. But ... there is evidence indicating that St. Francis as of January [1980] was not going to be far out in front of the crowd, that it was going to be offering wages equivalent to the wages offered by other hospitals in the area.
 Counsel for the NLRB: .... We have evidence that there were two of the many hospitals in the Milwaukee area whose increases were by that time to be comparable, just based on the 10% increase.
 
 
 [4]
 Counsel for the NLRB acknowledged that the merit increase reinstituted a benefit St. Francis historically offered but had dropped for one year, and that the record was barren on the question whether "other hospitals had ever stopped a merit increase that was in place, as St. Francis had."
 
 
 [5]
 See Weiler, Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA, 96 HARV.L.REV. 1769, 1795-1803 (1983)