PEDRO'S INC., d/b/a Pedro's Restaurant, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Hotel, Motel and Restaurant Employees and Bartenders Union, etc., Intervenor.

No. 79–2443.

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1981.

Decided April 13, 1981.

---

Lawrence E. Blatnik, Atty., N.L.R.B., Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B. , Washington, D. C., with whom Robert E. Allen, Acting Associate Gen. Counsel, Washington, D. C., were on the brief, for respondent.

Barry S. Jellison entered an appearance for intervenor.

J. Mark Montobbio, San Francisco, Cal., with whom John H. Feldman III was on the brief, for petitioner.

Before McGOWAN, Chief Judge, and ROBINSON and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Pedro's, Inc. (the "company") here seeks review of a decision and order of the National Labor Relations Board ("NLRB" or the "Board").[1] The Board has filed a cross-application for enforcement of its order. For reasons set forth below, we hold that only certain of the Board's unfair labor practice findings are entitled to enforcement, and remand this case to the Board for further proceedings.

## I. BACKGROUND

Pedro's is a restaurant and bar located in Los Gatos, California. On about January 18, 1978, an employee of the restaurant contacted the Hotel and Restaurant Employees and Bartenders Union, Local 19, to discuss the possibility of organizing Pedro's employees. ALJ 3.[2] The union held a number of employee meetings, and several employees signed cards authorizing the union to serve as the exclusive bargaining representative of Pedro's employees. On February 2, 1978, a union representative hand-delivered to the company a letter stating that the union had obtained authorization cards from a majority of Pedro's employees. ALJ 4. On February 17, after company management had responded that they had a good faith doubt that the union represented an uncoerced majority of the employees, the union filed a petition for an election with the NLRB. An election was

---

1. *Pedro's, Inc.*, 246 N.L.R.B. No. 92 (Nov. 23, 1979).

2. "ALJ" refers to the decision of Administrative Law Judge Earldean V. S. Robbins, adopted by the Board and appended to its decision and order.

held on April 21, 1978, and the union was defeated by a vote of 56 to 36. ALJ 1.

The union challenged the results of the election, and filed unfair labor practice charges against the company. After a hearing, the Board found that Pedro's had committed several violations of Section 8(a)(1)[3] of the National Labor Relations Act ("NLRA" or the "Act")[4] during the course of the union campaign. ALJ 4–17. In addition, the Board ruled that this unlawful conduct undermined the union's majority and rendered doubtful or impossible the holding of a free and fair second election. ALJ 22–32. As a result, and pursuant to standards announced in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board ordered the company to bargain collectively with the union. Pedro's challenges the unfair labor practice determinations made by the Board, and the issuance of a bargaining order in this case.

## II. THE SECTION 8(a)(1) VIOLATIONS

### 1. *Introduction*

With two important exceptions set forth below, we hold that substantial evidence exists to support the findings of the Board that the company committed several violations of Section 8(a)(1) of the Act during the union campaign.[5] Although each of these findings is vigorously contested by the company, it is firmly established that findings of the Board are entitled to judicial enforcement if supported by substantial evidence. 29 U.S.C. § 160(e) (1976); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

We are unable to find substantial evidence, however, to support a finding of the Board that the company violated Section 8(a)(1) by implementing a health insurance plan for its employees during the union organizational drive. Proper resolution of this issue requires a detailed review of the facts surrounding the implementation of the plan.

### 2. *The Facts Relating to the Establishment of the Health Insurance Plan*

The subject of health insurance coverage for employees of the restaurant first arose in either late 1975 or at some unspecified time in 1976. ALJ 7. Employees were told on this first occasion that the restaurant was not in a suitable financial position to provide insurance. *Id.* However, on April 23, 1977, the subject again arose during an employee meeting, and Peter S. Ramirez, president and co-owner of the company, told employees that the company was in a position to begin to collect bids from insurance companies. ALJ 8. Ramirez stated that he thought coverage could be secured by the end of the year. No date was mentioned, however, as to when such a plan would go into effect. *Id.*

Although the company contends that several insurance companies were contacted unsuccessfully after the April 23 meeting, the only documentary evidence to support this contention is a letter dated November 18, 1977, indicating that State Farm Insurance had been requested to submit a bid. ALJ 8. In mid-December 1977, however, Harold Hobson, an experienced insurance broker, was introduced to company management and agreed to solicit additional bids. *Id.* Hobson contacted the Prudential Life Insurance Company and the New York Life Insurance Company. Another broker, Jack Montgomery, also solicited bids from

---

3. Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of rights protected by the Act.

4. 29 U.S.C. §§ 151–69 (1976 & Supp. III 1979).

5. These findings are described at length in the opinion of the Administrative Law Judge. *See* ALJ 4–17. In particular, the Board found that the company had violated the Act by coercively interrogating employees concerning their union activities; threatening an employee with discharge because of his union activities; soliciting grievances from employees in order to discourage them from supporting the union; promulgating a no-solicitation/no-distribution rule in order to discourage employees from engaging in union activities; and promising, announcing and granting benefits in order to induce employees to reject the union.

three additional underwriters. *Id.* During January, 1978, several meetings were conducted between company officials and representatives of the insurance companies. ALJ 8; A. 99, 263.[6] On February 1, 1978, Prudential submitted a formal, written proposal. ALJ 8. The company compared this proposal with the others subsequently received from other underwriters, and, on March 6, 1978, Pedro's executed an application with Prudential and tendered the initial premium that commenced coverage of the plan. ALJ 10.[7]

In mid-March, Ramirez held a meeting with the employees and informed them that they had been insured for a week. ALJ 7. He introduced Hobson and a representative from Prudential, who in turn explained the new health insurance coverage and gave the employees forms to fill out. No reference to the union was made at this meeting. *Id.*

3. *The Legality of the Grant of Insurance Benefits*

 It is firmly established that an employer may not grant benefits to employees during an organizational drive in an attempt to influence the outcome of a pending election. In *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), the Supreme Court held:

We have no doubt that [Section 8(a)(1)] prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect.

375 U.S. at 409, 84 S.Ct. at 459. However, a benefit granted in the normal course of the business of an employer, without any motive of inducing employees to vote against the union, does not violate the Act. *NLRB v. Tommy's Spanish Foods, Inc.*, 463 F.2d 116 (9th Cir. 1972); *Jervis Corp., Bolivar Division v. NLRB*, 387 F.2d 107 (6th Cir. 1967).[8] The question presented, therefore, is whether the disputed insurance benefit was granted in the normal course of business by the employer, or outside the normal course of business in an attempt to influence the outcome of the election. In *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1130 (9th Cir. 1978), the court stated that "[t]he question quite simply is whether the employer in good faith sought to comply with the requirements of law." [9]

In the present case, the Board acknowledged that preparations for the implementation of a health insurance plan had begun well in advance of the union organizational drive. The ALJ concluded that the compa-

---

6. "A."refers to the Appendix submitted in this case.

7. Hobson testified that, according to his experience with restaurants the size of Pedro's, a minimum of two months is required to execute a formal application for insurance coverage from the time that he is initially contacted to solicit bids. ALJ 10. We note that the insurance plan in this case was implemented approximately two months after Hobson began soliciting bids for the company.

8. Indeed, it is unlawful for an employer to *withhold* a benefit during a union campaign that is customarily granted to employees. In *May Department Stores Co.*, 174 N.L.R.B. 770 (1969), the Board held that "an employer confronted with a union organizing campaign should decide the question of granting or withholding benefits as he would if a union were not in the picture; if his course of action in granting or withholding benefits is prompted by the Union's presence, he violates the Act." Courts have recognized the "dilemma" facing an em-

ployer considering a grant of benefits during a union campaign, for "to hold that in judging employer motive one must hypothesize a case where no union is watchfully present is to ask the employer to behave in an extraordinarily disinterested fashion and to ignore a company problem that management simply cannot be expected to ignore." *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1130 (9th Cir. 1978).

9. A violation of the Act may also be found where benefits, although granted for business reasons, are announced "right before an election and sprung on the employees in a manner calculated to influence the employees' choice." *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275, 280 (1st Cir. 1975). *See also J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 492 (4th Cir. 1972). Thus, both the granting of the benefit and the timing of the grant must occur in the normal course of business.

ny "had commenced serious attempts to secure health insurance coverage prior to the commencement of the union organizational campaign." ALJ 15. The Board here contends, however, that Pedro's "accelerated" its efforts to locate and implement a plan upon learning of the union activities of its employees.

■ In reviewing the record in this case, we are unable to find any evidence that the company accelerated its efforts to implement a health insurance plan because of the union's organizational drive. The company had initially announced the possibility of an insurance plan in April of 1977. At least one insurer was contacted between April and November, 1977. Then, in December 1977, well before the union campaign began, the company secured the services of an experienced insurance broker. From the moment that Hobson entered the picture, substantial progress was made in obtaining bids and securing a plan. In addition, there was nothing unusual about the amount of time that it took Hobson to secure an insurance plan for the company, and the plan was implemented within a time frame that was consistent with industry practice. ALJ 10. In short, the Board has produced no evidence that the health insurance plan was implemented outside the normal course of business, in an attempt to induce employees to vote against the union.[10]

We are aware that certain courts have imposed a heavy burden on an employer to justify a grant of benefits during a union election campaign.[11] In this case, the company presented evidence that it was the introduction of insurance broker Hobson, and not the union organizational drive, that advanced the implementation of the health insurance plan. The Board has found nothing to rebut this evidence. Thus, to the extent that the company had a burden to justify the implementation of the health insurance plan in a case of this sort,[12] that burden has been met.

In *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 410, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964), the Supreme Court stated that "[o]ther unlawful conduct may often be an indication of the motive behind a grant of benefits while an election is pending, and to that extent it is relevant to the legality of the grant." Thus, if uncertainty exists as to employer motive, an improper motive may be inferred from the presence of unlawful conduct with respect to other events. In the present case, however, the company produced ample evidence that preparations for the implementation of a health insurance plan were begun well in advance of the union campaign, and that a plan was implemented in the normal course of business when negotiations were completed.

10. Nor is there any evidence that the timing of the announcement that health insurance coverage had been secured was intended to influence the employees' choice. Employees were informed of the coverage one week after the plan was implemented, and well over a month before the April 23 election. In *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275, 281 (1st Cir. 1975), the court noted that "[i]t is obvious that the closer a wage benefit comes to the day of the election, the harder it will be for the union to answer, and the greater the danger that the benefit will be manipulated to sway the election."

11. For instance, the First Circuit has stated: We think when an employer, without having some fairly rudimentary factual explanation for the timing, announces benefits after the petition for election is filed and two weeks before a representation election, it must take the chance that the Board will ascribe to it improper motives.

*NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275, 282 (1st Cir. 1975).

The burden of proving unlawful employer motivation in granting a benefit is of course on the Board. *Jervis Corp., Bolivar Division v. NLRB*, 387 F.2d 107, 113 n.4 (6th Cir. 1967). The implementation of a benefit before a scheduled election, however, without a showing of business justification, has itself been deemed evidence of improper motive. *J. P. Stevens & Co. v. NLRB*, 461 F.2d 490, 493 (4th Cir. 1972). In *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1129 (9th Cir. 1978), the court held that this rebuttable inference of anti-union motive could not be drawn in cases in which an employer is placed in a "dilemma" as to whether to grant the benefit because a *withholding* of the benefit could be found to violate the Act. *See* note 6, *supra*.

12. *See* note 11, *supra*.

The Board has found nothing to rebut this evidence. Therefore, we do not believe that an inference of improper motive may be drawn from the fact that the employer has been found guilty of unfair labor practices relating to incidents that arose *after* the union campaign had commenced and that had nothing whatsoever to do with the insurance plan.

Our ruling here is consistent with the Board's own recent decision in *American Sunroof Corp.*, 248 N.L.R.B. 748 (1980). In *American Sunroof*, the company considered implementing a new pension plan for its employees for over two years. After a union organizational drive began at one plant, the company agreed on a final plan. Although this plan was announced to employees one day before a scheduled election, the Board found no violation of the Act. As stated by the Board:

> In sum, whatever dividend Respondent received from the announcement of the pension plan, it is clear that Respondent granted this benefit for reasons unrelated to the union activity and that it lawfully announced this benefit when, in the normal course of business, the plan was finalized.

248 N.L.R.B. at 749.[13]

Similarly, it is clear on the record before us that Pedro's implemented a health insurance plan for reasons unrelated to the union activity, and that it lawfully announced this benefit when, in the normal course of business, the plan was finalized. The Board simply has failed to present sufficient evidence that the company accelerated its efforts to implement a health insurance plan as a result of the union campaign. As a result, we decline to enforce the finding of the Board that the implementation of the plan violated Section 8(a)(1).[14]

## III. THE BARGAINING ORDER

The Board concluded in this case that the Section 8(a)(1) violations committed by company undermined the union's majority and prevented the Board from holding a fair rerun election. ALJ 22–32. As a result, the Board ordered the company to recognize and bargain collectively with the union as the exclusive bargaining representative of the company's employees. Pedro's challenges the issuance of a bargaining order in this case.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610–16, 89 S.Ct. 1918, 1938–1941, 23 L.Ed.2d 547 (1969), the Supreme Court made it clear that the Board may issue bargaining orders in (1) "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices, 395 U.S. at 613, 89 S.Ct. at 1939, and in (2) "less extraordinary cases marked by less pervasive practices which nonetheless still have a tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940.[15] With respect to this first category of cases, the Court left open the possibili-

---

**13.** Although the pension plan in *American Sunroof* was implemented on a companywide basis while the union organizational activity was limited to one plant, we do not believe that the case is distinguishable on that basis. No showing is apparent in *American Sunroof* that the timing of the announcement, *one day* before a scheduled election at one plant, was not chosen to affect the outcome of the election at that plant. *Cf. NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 675 (1st Cir. 1979) (Section 8(a)(1) violation found in announcement of corporatewide benefit during union campaign at one plant, since no showing made that timing of the announcement had not been chosen to affect the outcome of that campaign.).

**14.** Similarly, we decline to enforce a finding of the Board that the company violated § 8(a)(1)

in informing employees at a January 26 employee meeting of progress made in securing health insurance coverage. As held in *NLRB v. Tommy's Spanish Foods, Inc.*, 463 F.2d 116 (9th Cir. 1972), an employer has the right to notify employees of efforts to improve employment conditions and benefits that were *in progress before a union campaign commenced.*

With these two exceptions, we enforce the § 8(a)(1) violations found by the Board, described in detail by the Administrative Law Judge. *See* ALJ 4–17.

**15.** It is in this second category that the present case falls. As the Board concluded, Pedro's conduct "undermined the Union's majority and rendered doubtful or impossible the holding of a free and fair second election." ALJ 31.

ty that a bargaining order could issue without need of inquiry into the union's majority status. However, with respect to the second category of cases, the Court held that a showing must be made that the union once held a majority status and that

> the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order.

*Id.* The Supreme Court cautioned that the election process remains the preferred and most satisfactory method of ascertaining whether a union has majority support, *id.* at 602–03, 89 S.Ct. at 1934, and emphasized that

> under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order.

*Id.* at 615, 89 S.Ct. at 1940.

Relying on these standards in *Gissel*, courts have refused to enforce bargaining orders issued by the Board where substantial evidence did not exist that unfair labor practices were serious enough, or pervasive enough, to have the tendency to undermine majority strength and impede the election process. *Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144, 150 (3d Cir. 1979); *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 120 (1st Cir. 1978). In *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434 (D.C. Cir. 1972), this court recognized that even though an unfair labor practice may justify setting aside the results of a Board conducted certification election, this

> does not mean that the effects of [an] unfair labor practice were sufficiently pervasive and lingering to warrant a determination that a subsequent election could not be held which would be reasonably free from the adverse influence of the Company's unlawful action.

474 F.2d at 442. *See also Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35 (D.C. Cir. 1980).

In the present case, the Board appeared to base the bargaining order largely on its belief that the implementation of the health insurance plan violated Section 8(a)(1). *See* ALJ 31. The Board found that Pedro's actions concerning the health insurance plan "would reasonably tend to encourage a belief on the part of the employees that the health insurance plan was instituted in specific redress of their grievances, thereby exerting a strong and lingering coercive effect on the employees' freedom of choice." *Id.* The Board argues in this court that Pedro's "conduct in soliciting employee grievances, promising that the most commonly expressed problems would be remedied, and granting benefits to employees is of particular significance in assessing the propriety of the Board's bargaining order in the instant case, since these types of unfair labor practices are an especially effective means of destroying employee support for unionization and are likely to have long-lasting effects." Brief for NLRB at 46.

We have held that the Board's finding that the implementation of the health insurance plan violated Section 8(a)(1) is not supported by substantial evidence and may not be enforced. As indicated above, the Board appeared to rely heavily on this violation to sustain the issuance of a bargaining order. Thus, absent a finding that the implementation of the health insurance plan violated the Act, a significant question is presented whether the remaining unfair labor practices in this case are serious enough, or pervasive enough, to have the tendency to undermine majority strength and prevent the holding of a fair rerun election.

■ We believe that it is proper, however, to remand this case to the Board for a determination of whether a bargaining order remains appropriate in this case. In *Gissel*, the Supreme Court stated that it is for the Board, and not the courts, to determine the appropriateness of a bargaining

order, "based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity." 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32.[16] Therefore, we express no opinion here on whether a bargaining order may issue on the facts of this case, and leave that question to the Board to determine in the first instance.[17]

In considering whether a bargaining order may issue, absent a finding that the implementation of the health insurance plan violated the Act, we emphasize that the Board must also consider the conditions in the bargaining unit at the time it renders its decision on remand. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 48 (D.C. Cir. 1980) ("[T]he Board should formulate its remedy in light of the violation with which it is faced *and* the conditions in the bargaining unit at the time it renders its decision.") (emphasis in original). As stated by this court in *Peoples Gas*, "[w]e think it clear that no responsible decision-making body can formulate a reasonable remedy without taking into account conditions at the time its order is entered." 629 F.2d at 45 n.18.

The order of the Board is enforced in part. The case is remanded to the Board for further proceedings.

So Ordered.

---

**16.** *See also NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 442 n.23 (D.C. Cir. 1972) ("[I]t is generally for the Labor Board, and not the reviewing courts, to make the determination of whether the circumstances of a particular case warrant issuance of a remedial bargaining order.").

**17.** All other aspects of the Board's remedial order are entitled to enforcement.