United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 3, 1998 Decided May 29, 1998

 No. 97-1335

 Perdue Farms, Inc., Cookin' Good Division, 

 Petitioner/Cross-Respondent

 v.

 National Labor Relations Board, 

 Respondent/Cross-Petitioner

 On Petition for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

 D. Christopher Lauderdale argued the cause for 
petitioner/cross-respondent. With him on the briefs was 
Erin E. Swann.

 David A. Fleischer, Senior Attorney, National Labor Rela-
tions Board, argued the cause for respondent/cross-petitioner. 
With him on the brief was Linda Sher, Associate General 


Counsel, and Aileen A. Armstrong, Deputy Associate General 
Counsel. Margaret A. Gaines, Supervisory Attorney, and 
Steven B. Goldstein, Attorney, entered appearances.

 Before: Silberman, Randolph and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Opinion dissenting in part filed by Circuit Judge Randolph.

 Tatel, Circuit Judge: After a union lost a representation 
election at a chicken processing plant, the National Labor 
Relations Board found that the company had committed 
unfair labor practices by interrogating employees about their 
union sympathies, as well as by increasing wages and imple-
menting a new attendance policy in order to influence the 
election. The Board also approved the administrative law 
judge's issuance of a preclusion order as a sanction for the 
employer's violation of a subpoena. Because substantial evi-
dence in the record supports the Board's findings, and be-
cause the ALJ's preclusion order was not an abuse of discre-
tion, we deny the company's petition for review and, with one 
exception, grant the Board's cross-application for enforce-
ment.

 I

 Two months after petitioner Perdue Farms, Inc. acquired a 
chicken processing plant in Dothan, Alabama, in January 
1995, the Laborers' International Union of North America, 
AFL-CIO, Local 784 began an organizational campaign. In 
April, the Union filed a petition for a representation election. 
The election occurred on June 15. The Union lost by a 
substantial majority.

 Objecting to the conduct of the election, the Union charged 
Perdue with violating sections 8(a)(1) and (3) of the National 
Labor Relations Act, 29 U.S.C. s 158(a)(1), (3) (1994). Sec-
tion 8(a)(1) makes it an unfair labor practice for an employer 
"to interfere with, restrain, or coerce employees in the exer-
cise of the rights guaranteed in section 157 of this title." Id. 
s 158(a)(1). Section 8(a)(3) prohibits "discrimination in re-
gard to hire or tenure of employment or any term or condi-


tion of employment to encourage or discourage membership 
in any labor organization." Id. s 158(a)(3).

 Following a seven-day hearing, the administrative law 
judge found that the employer had violated sections 8(a)(1) 
and (3) of the Act. Adopting the ALJ's findings, the Board 
agreed that Perdue violated section 8(a)(1) by interrogating 
employees about their union activities and sympathies, by 
confiscating union materials from employees entering the 
plant, by threatening to close the plant if the Union won the 
election, by promising increased benefits, by changing the 
plant attendance policy two days before the election, and by 
timing a wage increase and elimination of an attendance 
bonus program for the day before the election, all in order to 
influence the election's outcome. Cooking Good Div. of Per-
due Farms, Inc., 323 N.L.R.B. No. 50, at 3-5, 8-10 (Mar. 31, 
1997). The Board also found that the timing of the wage 
increase and the changing of the attendance policy violated 
section 8(a)(3), id. at 9-10, a somewhat surprising conclusion 
in view of the fact that section 8(a)(3) has no applicability 
where, as here, the record contains no evidence of discrimina-
tion. Conceding this point, agency counsel advised us at oral 
argument that the Board no longer sought enforcement of the 
section 8(a)(3) portion of its order. The Board found that the 
interrogation of employees, the confiscation of union materi-
als, the timing of the wage increase, and the changing of the 
attendance policy also constituted objectionable conduct af-
fecting the election. It thus issued a cease-and-desist order, 
set aside the results of the election, and ordered a new one. 
Id. at 12.

 Perdue now petitions for review of the Board's findings 
regarding the wage increase, the changed attendance policy, 
and the interrogation of employees. Perdue also challenges 
the ALJ's exclusion of certain evidence as a sanction for the 
company's violation of a subpoena. The Board cross-applies 
for enforcement.

 II

 We begin with the company's challenge to the ALJ's exclu-
sion of evidence. Prior to the hearing, the Board's General 


Counsel served Perdue's human resources manager, Jimmy 
Chappell, with a subpoena duces tecum requesting notes and 
other records "which reflect the content of meetings between 
Jimmy Chapel [sic] and employees conducted between May 1, 
1995 and June 15, 1995." Although Perdue produced undated 
notes of meetings that it asserted occurred on or about May 
11, it refused to produce any other documents relating to 
meetings occurring between May 1 and June 15. Perdue 
argued that the subpoena was "overly broad" because, al-
though the subpoena sought documents for a six-week period, 
the original complaint alleged violations by Chappell only on 
or about May 11. Rejecting Perdue's argument and quoting 
the Federal Rules of Evidence's definition of "relevant evi-
dence," the ALJ concluded that the company's view of rele-
vance was overly narrow, noting that six unfair labor practice 
allegations named Chappell, that witnesses testified to meet-
ings Chappell held from March to late May, and that the 
notes could contain "admissions relating to other aspects of 
the case." Cooking Good Div., 323 N.L.R.B. No. 50, at 5. 
Pointing out that Perdue claimed no privilege and neither 
asked for in camera review of the disputed notes nor offered 
any other reason for refusing to produce them, the ALJ 
barred the company from introducing virtually any evidence 
regarding Chappell's meetings, including the May 11 meet-
ings for which Perdue had provided notes. Id.

 Perdue challenges the ALJ's ruling on two accounts: It 
claims that documents relating to the June meetings were 
irrelevant; it also claims that having produced all requested 
documents regarding Chappell's May 11 meetings, it should 
have been allowed to present testimony and documentary 
evidence about those meetings. Reviewing the ALJ's ruling 
for abuse of discretion, Dayton Hudson Dep't Store Co. v. 
NLRB, 79 F.3d 546, 552 (6th Cir. 1996), we reject both 
arguments.

 Section 11(1) of the National Labor Relations Act, 29 
U.S.C. s 161(1), authorizes subpoenas for evidence "that re-
lates to any matter under investigation or in question." Id. 
Information sought in an administrative subpoena need only 
be "reasonably relevant." United States v. Morton Salt Co., 


338 U.S. 632, 652 (1950); see also NLRB v. Line, 50 F.3d 311, 
314 (5th Cir. 1995) (applying Morton Salt's "reasonably rele-
vant" standard to NLRB subpoenas). Citing In re Sealed 
Case (Admin. Subpoena), 42 F.3d 1412 (D.C. Cir. 1994), 
where we quashed a subpoena seeking information about 
"other wrongdoing, as yet unknown," id. at 1419, Perdue 
argues that the request for documents regarding meetings in 
June lies beyond even the broadest notions of relevance. We 
disagree. Unlike the subpoena in In re Sealed Case, the 
subpoena here sought not information regarding "other 
wrongdoing, as yet unknown," but information relating to 
specific allegations of wrongdoing contained in the General 
Counsel's complaint. As the ALJ found, the subpoenaed 
material could have provided evidence regarding specific alle-
gations not involving Chappell and/or events occurring from 
May 1 to the June 15 election. Under these circumstances, 
the ALJ's conclusion that the subpoenaed material was rele-
vant did not amount to an abuse of discretion.

 We reach the same conclusion with respect to the ALJ's 
preclusion order. "The preclusion rule," we have said, "pre-
vents the party frustrating discovery from introducing evi-
dence in support of his position on the factual issue respecting 
which discovery was sought." Atlantic Richfield Co. v. U.S. 
Dep't of Energy, 769 F.2d 771, 794 (D.C. Cir. 1984). Pointing 
out that it had not "frustrat[ed] discovery" with respect to 
Chappell's May 11 meetings, Perdue argues that it should 
have been allowed to offer testimony about those meetings 
and to establish, contrary to the testimony of certain employ-
ees, that Chappell conducted no other meetings during the 
month. Once a party's challenge to a subpoena has been 
rejected, however, the party cannot "pick and choose which 
parts ... it will obey and which parts it can ignore." UAW v. 
NLRB, 459 F.2d 1329, 1342 (D.C. Cir. 1972). A party refus-
ing to comply with a subpoena risks application of the preclu-
sion rule: "Without an adequate evidentiary sanction, a party 
served with a discovery order in the course of an administra-
tive adjudicatory proceeding has no incentive to comply, and 
ofttimes has every incentive to refuse to comply." Atlantic 
Richfield, 769 F.2d at 795.


 III

 Turning to Perdue's substantive challenges, we will not set 
aside a Board decision unless, "reviewing the record as a 
whole, it appears that the Board's factual findings are not 
supported by substantial evidence or that the Board acted 
arbitrarily or otherwise erred in applying established law to 
the facts at issue." Synergy Gas Corp. v. NLRB, 19 F.3d 
649, 651 (D.C. Cir. 1994). Our review of the Board's factual 
conclusions is "highly deferential." LCF, Inc. v. NLRB, 129 
F.3d 1276, 1281 (D.C. Cir. 1997); see also Synergy Gas Corp., 
19 F.3d at 654 (Silberman, J., concurring) ("Our review, both 
in theory and in practice, is quite deferential."). "If there is 
substantial evidence to support the Board's conclusions, we 
will uphold the Board's decision even if we would have 
reached a different result had we considered the question de 
novo." Id. at 651.

 Interrogation of Employees

 Claiming the Board erroneously applied the relevant legal 
standard, Perdue challenges the Board's determination that 
Chappell violated section 8(a)(1) by interrogating employees 
when he asked them if Union representatives had visited 
them at their homes. Interrogation of employees violates 
section 8(a)(1) if, under all the circumstances, it reasonably 
"tends to restrain, coerce, or interfere with rights guaranteed 
by the Act." Rossmore House, 269 N.L.R.B. 1176, 1177 
(1984). Both the Board and the courts agree that the start-
ing point for determining whether unlawful interrogation has 
occurred is the five-factor test set forth in Bourne v. NLRB, 
332 F.2d 47 (2d Cir. 1964):

 (1) The background, i.e., is there a history of employer 
 hostility and discrimination?

 (2) The nature of the information sought, e.g. did the 
 interrogator appear to be seeking information on which 
 to base taking action against individual employees?

 (3) The identity of the questioner, i.e., how high was 
 he in the company hierarchy?


 (4) Place and method of interrogation, e.g., was em-
 ployee called from work to the boss's office? Was there 
 an atmosphere of "unnatural formality"?

 (5) Truthfulness of the reply.

Id. at 48; see also Chauffeurs, Local 633 v. NLRB, 509 F.2d 
490, 494 (D.C. Cir. 1974). Determining whether employee 
questioning violates the Act does not require strict evaluation 
of each factor; instead, "[t]he flexibility and deliberately 
broad focus of this test make clear that the Bourne criteria 
are not prerequisites to a finding of coercive questioning, but 
rather useful indicia that serve as a starting point for assess-
ing the 'totality of the circumstance.' " Timsco Inc. v. NLRB, 
819 F.2d 1173, 1178 (D.C. Cir. 1987).

 Reviewing the entire record and the Board's decision and 
" 'recogniz[ing] the Board's competence in the first instance 
to judge the impact of utterances made in the context of the 
employer-employee relationship,' " Southwire Co. v. NLRB, 
820 F.2d 453, 456 (D.C. Cir. 1987) (quoting NLRB v. Gissel 
Packing Co., 395 U.S. 575, 620 (1969)), we think the Board 
properly applied the Bourne factors and that its section 
8(a)(1) finding is supported by substantial evidence. Employ-
ee Willie Jackson testified that during a meeting with about 
fifty employees on or about May 19, Chappell asked whether 
"our homes and everything had been visited, you know, by 
the union associate." According to Jackson, he and one other 
man raised their hands in response. Chappell denied that the 
meeting ever occurred, but the ALJ discredited his testimo-
ny, credited Jackson's testimony instead, and found that 
Chappell had questioned employees in violation of section 
8(a)(1). The ALJ said:

 The setting of the interrogation was a general meeting of 
 employees and the record does not reflect that the union 
 sympathies of those present were known to [Perdue]. 
 The questioner was a high official of [Perdue] who gave 
 no assurances that by asking the question the employees 
 would have nothing to fear. Additionally, Chappell was 
 from the Maryland headquarters and did not have any 
 established friendly relationship with the Alabama work-


 ers. There was no apparent legitimate reason for the 
 question, but by seeking this information [Perdue] could 
 learn who had been talking to the Union's organizers.

Cooking Good Div., 323 N.L.R.B. No. 50, at 5.

 Although we agree with Perdue that the "place and meth-
od" of Chappell's questioning of employees (the fourth 
Bourne factor) were not particularly coercive, the other 
Bourne factors support the Board's finding of unlawful inter-
rogation. Chappell came from Perdue's headquarters and 
served as its top human resources supervisor (factor 3). See 
Bourne, 332 F.2d at 48; Midwest Reg. Joint Bd., Amalgam-
ated Clothing Workers of Am., 564 F.2d 434, 443 (D.C. Cir. 
1977). In his questions to employees, Chappell appeared to 
seek information about individual employee union sympathies 
(factor 2). Cf. Allegheny Ludlum Corp. v. NLRB, 104 F.3d 
1354, 1359 (D.C. Cir. 1997) (" '[A]ny attempt by an employer 
to ascertain employee views and sympathies regarding union-
ism generally tends to cause fear of reprisal in the mind of 
the employee if he replies in favor of unionism and, therefore, 
tends to impinge on his [statutory] rights.' ") (quoting Struk-
snes Constr. Co., 165 N.L.R.B. 1062, 1062 (1967)). Perdue 
claims that the ALJ considered circumstances outside the 
Bourne factors, i.e., that Chappell "gave no assurances that 
by asking the question the employees would have nothing to 
fear," Cooking Good Div. 323 N.L.R.B. No. 50, at 5, but both 
this court and the Board have found that failure to give such 
assurances is relevant to the unlawful interrogation determi-
nation. See Midwest Reg. Joint Bd., 564 F.2d at 443; Fiber 
Glass Sys., Inc., 298 N.L.R.B. 504, 504-05 (1990).

 Challenging the ALJ's finding that Chappell had no legiti-
mate reason to interrogate employees, Perdue claims that 
because it had received complaints that Union organizers 
were representing themselves as Perdue agents when visiting 
employees in their homes, it needed to know the answers to 
Chappell's questions to gauge the reach of the Union's mis-
representations. But Perdue received the complaints over a 
month before the Union filed its election petition, the compa-
ny immediately met with employees to warn them that Union 


organizers representing themselves as Perdue agents were 
reportedly visiting employee homes, and the meeting at which 
Chappell questioned employees occurred over two months 
later, a week after the election had been scheduled. Because 
Perdue never claimed that it was still receiving complaints at 
that time, we think the record supports the Board's conclu-
sion that Chappell had no legitimate reason for asking the 
question.

 June 14 Wage Adjustment

 The day before the election, on June 14, Perdue informed 
employees that they would receive an eighty-cents-per-hour 
pay increase, in part to replace the predecessor company's 
attendance bonus program under which employees received 
bonuses for perfect attendance. Acknowledging that the 
amount of the wage adjustment was not "out of the ordinary," 
the Board concluded that its timing was nevertheless "trou-
bling" because "it would be reasonable for the employees to 
view the timing of the raise as designed to influence their 
voting in the election." Cooking Good Div., 323 N.L.R.B. No. 
50, at 9.

 The Supreme Court has interpreted section 8(a)(1) to pro-
hibit "conduct immediately favorable to employees which is 
undertaken with the express purpose of impinging upon their 
freedom of choice for or against unionization and is reason-
ably calculated to have that effect." NLRB v. Exchange 
Parts Co., 375 U.S. 405, 409 (1964). Granting benefits does 
not violate the Act if it occurs "in the normal course of the 
business of an employer, without any motive of inducing 
employees to vote against the union." Pedro's Inc. v. NLRB, 
652 F.2d 1005, 1008 (D.C.Cir.1981). Put another way, "[a]s a 
general rule, an employer's legal duty in deciding whether to 
grant benefits while a representation proceeding is pending is 
to decide that question precisely as it would if the union were 
not on the scene." United Airlines Servs. Corp., 290 
N.L.R.B. 954, 954 (1988). Both the decision to confer bene-
fits and the timing of the announcement of such benefits are 
subject to "in the normal course of business" analysis: "[T]he 
timing of the announcement of a wage increase may violate 


section 8(a)(1), 'even though the employer's initial decision to 
raise wages was perfectly legitimate.' " St. Francis Fed. of 
Nurses and Health Prof'ls v. NLRB, 729 F.2d 844, 850 (D.C. 
Cir. 1984) (quoting J.J. Newberry Co. v. NLRB, 645 F.2d 148, 
151 (2d Cir. 1981)).

 Perdue claims that it always intended to follow the previous 
owner's practice of granting wage increases between June 1 
and July 1 and that the timing of the wage adjustment 
occurred "in the normal course of business." "Doubt[ing]," 
these assertions, the Board found that the company offered 
no documentary evidence that it intended to follow the prac-
tices of the predecessor company, that Perdue "never told 
employees to expect raises in June," and that the employees' 
"first knowledge of when the raises would be received was the 
day before the election." Cooking Good Div., 323 N.L.R.B. 
No. 50, at 9. Evidence in the record supports these findings. 
One employee testified that in January, shortly after Perdue 
acquired the Dothan processing plant, it told employees it 
would increase wages and eliminate the attendance bonus, but 
that it gave no timetable. Responding to the Union's organiz-
ing efforts, the vice president and general manager of Per-
due's Dothan division, Larry Winslow, sent a March 30 letter 
to all employees explaining the company's plans with regard 
to changes in wages and benefits, but acknowledging that 
Perdue had no "exact timetable for those decisions." The 
Winslow letter merely promised improved benefits and wages 
"[i]n the next few months." Employees who later asked 
when the company would adjust wages and benefits testified 
they received vague responses. One employee testified that 
when she asked Jimmy Chappell about wages and benefits, he 
responded "July 1"; but when she asked him the same 
question on another occasion, "he said that he didn't want to 
give [the] exact date of July 1, because he didn't want to say 
July 1 and it wasn't." Another employee testified that when 
Chappell was asked about pay raises at a May meeting, he 
replied that he "couldn't give us any information on a pay 
increase, but that there was supposed to be a person coming 
later to discuss the pay increase." In sum, the record 
supports the Board's finding that Perdue neither promised a 


mid-June wage adjustment nor informed Dothan employees 
that it intended to follow the predecessor's practice of award-
ing annual wage adjustments in June or early July. Thus, 
even if the predecessor company's practice was to announce 
wage adjustments only days before they were to take effect, 
as Perdue contends, because Dothan employees had no rea-
son to know Perdue was following the predecessor's practice, 
they could reasonably have viewed the election eve announce-
ment as an attempt to discourage their support for the Union.

 Both Perdue and our dissenting colleague argue that June 
14 was the only day Perdue could safely grant a wage 
increase because any deviation from that date would have 
risked a Board finding that it accelerated or postponed the 
increase in order to influence the election. This argument 
ignores not only that the Board's finding of a section 8(a)(1) 
violation rested on the company's failure to inform its employ-
ees that it intended to follow its predecessor's practice, but 
also the fact that the predecessor's practice was to raise 
wages, not on June 14, but anytime between June 1 and July 
1. By failing to announce that it intended to follow its 
predecessor's practice and by announcing the pay increase on 
the eve of the election, Perdue put itself in the worst possible 
position to claim that it had not attempted to influence the 
election.

 Our dissenting colleague also criticizes the Board's case law 
regarding wage increases implemented prior to elections. 
See Diss. Op. at 1-2. Perdue, however, makes no such 
argument, and normally we do not address issues the parties 
fail to raise. See Ryan v. Bentsen, 12 F.3d 245, 249 n.5 (D.C. 
Cir. 1993).

 June 13 Change in Attendance Policy

 Challenging the Board's conclusion that it violated section 
8(a)(1) by announcing a change in its attendance policy two 
days before the election in order to "discourage the employ-
ees' support for the Union," Cooking Good Div., 323 N.L.R.B. 
No. 50, at 10, Perdue argues not that it implemented the 
change for some reason other than to influence the election, 


but rather that in June 1995, it made no change in the policy. 
We think the record contains sufficient evidence to support 
the Board's contrary finding. Dothan employee Bryan Smith 
testified that he attended a June 13 meeting where Supervi-
sor Tony Williams told employees that the company was 
changing the attendance policy. Although admitting that he 
first learned the specific details of the old policy at the 
meeting, Smith testified that under that policy employees 
were "written up" the first time they were late or missed a 
day, and that Williams described the new policy as "when you 
missed a day, that would count as half an occurrence. And 
that if you missed two days, that was like, then you missed 
the whole day, so then you got ... wrote up." As corrobora-
tion for Smith's testimony, the Board pointed to a June 30 
memorandum (two weeks after the election) from senior 
human resources representative Ed Scarborough, stating:

 We are having more associates to come in late to work 
 [sic], since we do not have the attendance bonus and each 
 late is a-half of an occurance [sic] against your attend-
 ance record. An associate that is late (2) two times has 
 the equal of (1) one whole occurance [sic], which is the 
 same as missing one full day and it may cause you to get 
 a written letter of warning and may even cause termi-
 nation if your record is already bad. We ask that each of 
 you be on time so that you will not have your attendance 
 record be a bad reflection on you.

According to Perdue, the Scarborough memorandum simply 
reminded employees that the predecessor company's attend-
ance policy remained in effect. The Board interpreted the 
memorandum differently: "The message in this memo is that 
[Perdue] has made ... changes relative to the elimination of 
the attendance bonus and the calculation of occurrences." 
Cooking Good Div., 323 N.L.R.B. No. 50, at 10. We think the 
Board's interpretation is not unreasonable. The memoran-
dum cites two reasons for increased tardiness: the elimina-
tion of the attendance bonus and the treatment of each 
instance of tardiness as one-half of an occurrence. The 
Board read the memorandum to mean that the latter, like the 


former, resulted from a recent change in policy at Dothan. 
Although Perdue offers an equally plausible interpretation of 
the memorandum, the standard under which we review Board 
findings does not permit us to "displace the Board's choice 
between two fairly conflicting views, even though the court 
would justifiably have made a different choice had the matter 
been before it de novo." Universal Camera Corp. v. NLRB, 
340 U.S. 474, 488 (1951). We will thus not disturb the 
Board's finding that the June 30 memorandum signaled that 
the attendance policy changed in June 1995.

 Perdue points to Scarborough's testimony that the compa-
ny did not change the attendance policy until January 1996, 
six months after the election. Even if true, Scarborough's 
testimony does not undermine the Board's finding that Per-
due also changed the policy in June 1995. Although Scarbor-
ough's testimony (that the change occurred in January 1996) 
differs from Smith's (that the policy changed in June 1995), so 
long as the record contains substantial evidence supporting 
the Board's findings, as it does here, we defer to the Board's 
analysis, even if other evidence in the record could support an 
alternative determination. See Harter Tomato Prods. Co. v. 
NLRB, 133 F.3d 934, 938 (D.C. Cir. 1998); see also Synergy 
Gas Corp., 19 F.3d at 651.

 Finally, to the extent that Perdue challenges Smith's credi-
bility, it has failed to meet the heavy burden required to 
overturn a credibility determination. " '[C]redibility determi-
nations may not be overturned absent the most extraordinary 
circumstances such as utter disregard for sworn testimony or 
the acceptance of testimony which is on its fac[e] incredible.' " 
E.N. Bisso & Son, Inc. v. NLRB, 84 F.3d 1443, 1445 (D.C. 
Cir. 1996) (quoting Amalgamated Clothing & Textile Workers 
Union v. NLRB, 736 F.2d 1559, 1563 (D.C. Cir. 1984)). The 
ALJ "credit[ed] Smith's testimony that Williams did an-
nounce a change in the attendance system to a less severe 
method at the June 13 meeting." Cooking Good Div., 323 
N.L.R.B. No. 50, at 10. While not expressly based upon 
observation of the witness's demeanor, the ALJ's decision to 
credit Smith's testimony reflected his consideration of con-
flicting testimony from Williams and Scarborough, as well as 


of Scarborough's June 30 memorandum. Although Smith 
admitted that his memory of the June 13 meeting was "not 
good," and needed to refresh his recollection before testifying, 
his testimony was neither incredible nor did it become so 
simply because he was not completely certain of every detail 
of the meeting. Because Perdue has failed to demonstrate 
"extraordinary circumstances," we decline to overturn the 
ALJ's decision to credit Smith's testimony. See NLRB v. 
Creative Food Design Ltd., 852 F.2d 1295, 1297 (D.C. Cir. 
1988) (refusing to overturn an ALJ's credibility determination 
because, after evaluating conflicting testimony, the ALJ cred-
ited one version of the evidence presented).

 IV

 We deny Perdue's petition for review. Except for the 
Board's section 8(a)(3) findings, we grant its cross-application 
for enforcement.

So ordered.



 Randolph, Circuit Judge, dissenting in part: When a 
traffic light simultaneously blinks "Stop" and "Go" everyone 
knows repairs are needed. If a motorist encountering the 
light proceeds ahead while another motorist pauses, it is 
unimaginable that both would be guilty of failing to heed the 
signal. The Board's "law" governing pre-election wage in-
creases is like the faulty traffic light and the Board's enforce-
ment of that "law" approaches the unimaginable. As the 
Board sees it, when yearly wage increases are the norm, and 
the one-year anniversary falls just before a representational 
election, employers who proceed to grant a raise on that date 
are illegally trying to influence the vote. The Board also 
believes that employers who hold back and let the date pass 
are just as guilty of an unfair labor practice. Board theory 
one is that a company giving the raise demonstrates its power 
over its employees, implicitly threatening them with the 
removal of benefits should they vote for the union; Board 
theory two is that a company postponing the wage increase 
until after the election unfairly attempts to scare its employ-
ees into voting against the union. Theory one has received 
the Supreme Court's blessing, see NLRB v. Exchange Parts 
Co., 375 U.S. 405, 409 (1964), and it has also received severe 
criticism. See Derek C. Bok, The Regulation of Campaign 
Tactics in Representation Elections Under the National La-
bor Relations Act, 78 Harv. L. Rev. 38, 113 (1964); Robert A. 
Gorman, Basic Text on Labor Law: Unionization and Collec-
tive Bargaining 164 (1976). Regardless of how Board theory 
one is judged working alone, when it is considered in tandem 
with Board theory two it rises--or more accurately falls--to 
the level of arbitrariness. Many courts and administrative 
law judges have expressed exasperation with the Board's 
Janus-faced doctrine. See, e.g., Pedro's, Inc. v. NLRB, 652 
F.2d 1005, 1008 n.8 (D.C. Cir. 1981); J.J. Newberry Co. v. 
NLRB, 645 F.2d 148, 151 (2d Cir. 1981); Free-Flow Packag-
ing Corp. v. NLRB, 566 F.2d 1124, 1130 (9th Cir. 1978); 
NLRB v. Otis Hosp., 545 F.2d 252, 255 (1st Cir. 1976); Osco 
Drug, Inc., 237 N.L.R.B. 231, 232-33 (1978). Why the Board 
does not call a halt to this nonsense is unfathomable. The 
Board plainly has the power do so. Through its Regional 


Directors, the Board can simply schedule elections at a time 
removed from the historical anniversary date for unit wage 
increases.

 Substantial evidence does not, in any event, support the 
Board's finding that Perdue gave the wage increases on June 
14, 1995, in order to influence the election scheduled for the 
next day, and thereby violated s 8(a)(1). Perdue acted on 
June 14 because the Board's bewildering doctrine gave the 
company no other realistic option. Perdue took over the 
Dothan, Alabama plant early in 1995. In previous years, 
employees at the plant received their annual pay raises 
between June 1 and July 1. In 1994, wage increases at 
Dothan were granted on June 15, the first day of the new pay 
period. We have held that employers may give wage increas-
es prior to an election "in the normal course of [ ] business," 
Pedro's, 652 F.2d at 1008, and "in a manner and at a time in 
accord with past practice," Allen v. NLRB, 561 F.2d 976, 981 
(D.C. Cir. 1977). There can be no dispute that it was 
Perdue's "normal" practice to maintain an acquired compa-
ny's customary date for granting a pay raise. At Dothan, 
only one day naturally suggested itself as the customary date: 
June 14, 1995, which as in the 1994 Dothan raise, represented 
the first day of the new pay period. Only that date could 
clearly be considered "in the normal course of business" at 
Dothan, and in compliance--if not with the precedents of the 
Board--at least with the decisions of this court.

 The obvious question is "What should the company have 
done differently?" One idea is that before the election Per-
due should have announced (1) that it was withholding grant-
ing a wage increase on the customary date in order to avoid 
the appearance of attempting to "bribe" employees to vote 
against the union, but (2) that it would grant the raise after 
the election no matter what the outcome. But in terms of the 
effect on employees, there is only one difference between the 
company's granting the wage increase on June 14 and giving 
a promise that the increase will occur on June 16, or some 
other time shortly after the election. The difference is not 
that the employees will feel less threatened by the company. 
The difference is that the announce-the-raise-but-give-it-later 
approach means employees will not get their raise on the 


customary date and thus will lose money. Who may the 
employees blame? Maybe the union. Better yet, the Board, 
and the courts who go along with the Board. As an alterna-
tive one might suppose that Perdue should have postponed 
the wage increase but made it retroactive to June 14. But by 
any measure there is no difference between announcing a 
wage increase on June 14, and announcing that a wage 
increase will be granted after the election, retroactive to June 
14. In any event, both of these options, and others, errone-
ously place the burden on Perdue to alter its normal business 
practice to accommodate the union election. See Newport 
Div. of Wintex Knitting Mills, 216 N.L.R.B. 1058, 1058 
(1975).

 I wish also to explain why I would reject the Board's 
conclusion that on June 13, two days before the election, 
Perdue relaxed Dothan's attendance disciplinary policy in 
order to influence votes, and thereby violated s 8(a)(1). See 
Cooking Good Div., 323 N.L.R.B. No. 50, at 9-10 (Mar. 31, 
1997). The evidence of any such change in policy is slim to 
nil. The Board relied chiefly on the testimony of employee 
Bryan Smith, who said he attended a meeting held by manag-
er Tony Williams. At first, Smith could not recall Williams 
discussing such a policy change, nor could he remember the 
date of the meeting, or whether it was close to the election. 
Smith also testified that he had no knowledge of the attend-
ance policy in place before the meeting. Only after reviewing 
his affidavit was Smith able to give June 13 as the meeting 
date. Smith then said Williams announced that the attend-
ance policy "changed" so that "when you missed a day, that 
would count as half an occurrence. And that if you missed 
two days, that was like, then you missed the whole day, so 
then you got write [sic] up...." J.A. 112. How Smith could 
take this as a "change" in policy when he admitted not 
knowing the existing policy is a mystery. Williams, on the 
other hand, flatly denied announcing any change to the 
attendance disciplinary policy at any time and Ed Scarbor-
ough, the human resources representative at Dothan, testified 


that Perdue first altered this policy on January 15, 1996--six 
months after the election.

 Scarborough also testified that he was very familiar with 
the attendance disciplinary policy instituted by the previous 
employer, which he described as follows:

 The first two times you are just verbally warned about 
 being absent; the third time you was [sic] out was a 
 written warning; the next time was a one-day suspen-
 sion; the next time a three-day; and then termination.1

J.A. 276. This matches the description of the "change" Smith 
said he heard about at the June 13 meeting.

 The Board also relied on a memo by Scarborough issued to 
employees on June 30, 1995. See Cooking Good Div., 323 
N.L.R.B. No. 50, at 10. But the document merely describes 
the existing attendance policy established by the previous 
employer: "An associate that is late (2) two times has the 
equal of (1) one whole occurrence, which is the same as 
missing one full day and it may cause you to get a written 
letter of warning...." J.A. 339.

 No one produced any written record of a policy change and 
not a single witness had a clear memory of any easing of the 
attendance policy before the election. If Perdue's goal had 
been to influence the election, one would have expected it to 

__________
 1 Scarborough described the new Perdue attendance policy 
implemented on January 15, 1996:

 The first two times you are [absent], there is just nothing done 
 about it, you are free; the third time you are out, you receive a 
 written verbal [sic] warning; the next time you get a second 
 warning; the third is a final warning; and then the fourth we 
 give a three-day suspension pending investigation of our rec-
 ords to make sure that our records are correct. If they are 
 correct, when they get the three-day suspension, they are 
 term[inat]ed. They can work off an incident, though every 28 
 days with Perdue.

J.A. 277-78.


broadcast the new policy loudly and clearly. Yet on this 
matter of importance to employees, there was no proof of any 
widespread knowledge among them. Given this state of 
affairs, there was no substantial evidence that Perdue made 
any policy change, let alone that it intended to influence the 
election.